Navarrete. The record will reflect that via the clerk we have received a document which we have authorized to be distributed entitled, Timeline of Events Related to Non-Compete Agreements Contained in Capstone's Employee Stock Option Plan, and this page is dated January 29, 2020. Thank you. Good morning, and may it please the Court, my name is Michelle Ferber, and I represent the appellants in this matter. I'm sorry to interrupt, I just want to make sure that I have some sense of context here. I take it all that's before us is the preliminary injunction now, right? Right now? Correct. The preliminary injunction is all that . . . Yeah, but something someday is going to happen with respect, presumably, to permanent injunction, the contract action, the other . . . I mean, there's more . . . I feel like I've been propelled back in time about a year and a half in order to be hearing something that happened a year and a half ago, whereas there are other parts of this, and you might just explain to me where this . . . I think I know, but just briefly explain to me, and I have a feeling our presider won't necessarily take this all for your time, but just to put it in context with whatever else is going on in the case. Absolutely, Your Honor. Yes, when we were here last, then this court vacated the preliminary injunction with instructions back to the district court. That took some time, and then there was the issuance of the, as we've discussed in the appeal, the finance of fact conclusions of law, and that's the appeal that you have in front of you. We also, since that time, based upon comments that the lower court made on our initial motion to vacate the preliminary injunction, that we should come back when the time periods had expired. We renewed that motion, and my fellow colleagues on the other side made various motions for summary judgment, adjudication, issue sanctions. I don't recall all of them. They were all heard together this fall. Judge Daniels understood that there was an appeal pending, and he also stated that he had made those motions to us before the end of the year. That hasn't happened. Not that year. So it could be that at least some subset of these covenants have expired? Correct. And that was the reason we asked permission for, and you graciously granted us, to present you just sort of with this timeline so you can see how far we are since the expiration of the covenants that are at issue with respect to the preliminary injunction. The preliminary injunction will have been issued. The first preliminary injunction, it will be three years in June that it was first issued, and the covenants were all two years on their face. There are other aspects to it, but I'm sure they'll be argued, and I appreciate you. Thank you. So as the Court notes, this is the second time that we have been here and have been From our perspective, it is just as wrong now as it was 18 months ago when we were last here, and just as wrong as it was 29 months ago when it was first issued. The appellants have been wrongfully restrained for over two and a half years from competing with the largest provider of workforce logistics in the industry. And just for context— Do they consider themselves restrained now? Do they consider themselves now restrained by this preliminary injunction? Absolutely. Absolutely. And for context, when we talk about words like workforce logistics industry, that is the name of the industry. It's a fancy way of saying that my clients load and unload trucks and warehouses. And my client is a one single shareholder company, very small, and Capstone on the other side represents itself as one of the largest, if not the largest, competitor in this workforce. And the scope and breadth of the preliminary injunction, as we've noted, it's not limited geographically, and it's vague and ambiguous as to customers because, for example, if Capstone has a customer called ABC Grocers, and ABC Grocers has 500 sites throughout the United States, and Capstone only services 200 of them, it's 300 sites serviced by other competitors in the industry, Judge Daniels has unequivocally stated that this preliminary injunction prevents my clients from bidding on those other 300 sites. Those are still Capstone clients. So when you couple that with the lack of geographic limitations, whether you look at Delaware law or California law, it is overbroad and should never have been issued in the first place. And then secondarily, at this point in time, from our perspective, for the injunction to have never had an end date in place is a clear abuse of error and should be reversed by this court. On remand, the district court, from our perspective, did not conduct its own independent legal analysis but simply adopted my adversary's recommendation that under the Minister's and Missionary's case, there should absolutely, under no circumstances, ever be a contractual choice of law. As we've cited in our papers, in the cases that have come down after the Minister's and Missionary's case, that is not true. There can be a choice of law discussion and decision where the application of the choice of law provision would be contrary to the fundamental policy of a state which has a material greater interest in the chosen state. Here, the contracts were signed in California by California residents performing work primarily in California. The new company, which has also enjoined, although it was the post-Minister's case law that you're referring to is not the court of appeals. These are appellate division cases? Yes, they're state cases, Your Honor. Well, I know that they're state cases. They're not the New York court of appeals. No, they're not in the New York court of appeals. That's correct. There are three of them that we have cited. And so I don't think that there was a suggestion or the intention, as we read it or as the courts have analyzed the Missionary's case since, that there is to never be an analysis. Certainly, the contact with the state is no longer relevant. But there are situations where there is this fundamental policy which has a greater interest. And we submit that it is unambiguously clear that California has the greater interest and that it would be contrary to the public policy of Delaware. There's been a lot of discussion from the other side that these provisions are not the language in Delaware or California. You can't arise from a sale. You have to have been agreed to be restrained because you sold something, because you had something to sell, a business or an asset or goodwill. None of my clients were the sellers. The sellers were large equity companies, Prudential and Fenway. And then there are two individuals, Mr. Shelton and Mr. Haley, who had goodwill to sell. They signed different agreements called RAAs, Restricted Activities Agreements. And as you can see on the timeline, the restricted covenants that my client signed, that the preliminary injunction are based on, were signed after both the capstone stockholder agreement and after the merger. They were not signed until July of 2015. If they were- Help walk us through what you think is the most helpful part of this chart. Okay. So for example- Just tell us exactly where to look. Okay, so if we look at the top, Mr. Navarretti. And these first three dates are the same for all of the individual defendants. Capstone enters into a stockholder agreement in August of 2014. In May of 2015, that's when the capstone pinnacle merger agreement is entered into. And it closes in June of 2015. That's signed by Fenway and Prudentials. And that's when the RAAs, the Restricted Activities Agreements, by Mr. Haley and Mr. Shelton for their goodwill are signed because they're part of the deal. Only after that, in July of 2015, because of the issuance of stock options to a variety of employees as part of their employment, do Mr. Navarretti, below him Mr. Poffenberger, and below him Mr. Willis, sign in exchange for employee stock options. Pretty standard. Now Mr. Rojas, who's also enjoined, he didn't sign a restricted stock agreement. He didn't get any stock, but he's enjoined nonetheless. So that's why those dates are important. But does it matter that they were RSAs and they were, I mean, if they provide what they provide, the fact that there's RSAs, what effect does that have on whatever restricted provisions are in them? Because under California and Delaware law, if restrictive covenants are issued in connection with employment or the issuance of stock options, that is given much greater scrutiny as to whether it is appropriate to enjoin people from earning a living because they got some stock options by being an employee. If, however, they are subject to the exception, in California it's actually statutory under the because you sold a business, you sold an asset, you sold them your goodwill. So it is very important that they were part of this employee stock option versus part of the sale. And that has been a fundamental misunderstanding in this case since the very beginning. And we have attempted and tried over and over again to get the attention of someone to really look at these and recognize that they were part of not the sale of goodwill or the sale of a business, but issued as part of their employment. But when we go down the chart that we provided with you, you see that where we are. Breyer, is there not testimony that these RSAs, the signing of the RSA agreements was part of the deal, was part of the sale? They're the only testimony that's been. That's a yes or no question. Not in the manner that I believe that you said. Not in the way in which it was cited. The testimony is that employees were offered stock agreements after the sale. Yes, as part of the sale. If the sale hadn't happened, I suppose none of these 30-plus employees would have been offered employee stock options. Part of the sale or the sale was a prerequisite to it. That's not the same thing. It's part. Right. It was not. Well. Obviously, there would be no RSA had they not had the sale, but that doesn't necessarily mean the same thing, does it? No, I don't think it does, Your Honor. I don't think it does. Because they could have the sale happened whether or not these employees were going to get the stock options and whether or not they were going to agree to sign them. They certainly had the choice to accept or reject an offer of stock because they had to pay tax on it. It wasn't free. And I gather one of them didn't. I don't believe he was ever offered it. Now, help us understand some other aspects of the record. And as you know, you're getting extra time. Thank you, Your Honor. As predicted by Judge Sack earlier. In the special appendix of page 17, we have the most recent findings of fact and conclusions of law in support of the issuance of the preliminary injunction. I think I know the answer to this. But I see that there's a redaction on that page. And there's a redaction later in several other headings. Can you tell us what or is that some sort of state secret? Or can you tell us what's been redacted? If my memory serves and the best I can recall is that these are some of the changes that Judge Daniels made from the copy that was provided to them. This seems to me offhand. I don't know this. It could be that these were the proposed findings of fact. And they've become the actual findings of fact by adoption of the district court. And so what's redacted is an indication that they were in fact summarily or I guess summarily is the right word, adopted by the district court. That is my understanding, Your Honor. We submitted our own set and our objections to virtually every one of these. And what was read into the record of the transcript when these were adopted was that there were very few changes made and they were adopted from our perspective ad hoc by the district court. Maybe you could describe also, since this is a preliminary injunction, it raises some arguable procedural questions for us. The district court did not merge any hearing on the preliminary injunction with a final injunction. I guess it could have done that, right? Yes. It's quite common. Is there a reason why this was not a permanent injunction? Is it — in what sense is it preliminary is what I'm getting at? Maybe it's a question you don't best address to your opponent, but — From my perspective, it's preliminary because there would never be a basis in this case for a permanent injunction. It's based upon a restrictive covenant of two years. That was the sole basis for the issuance of the injunction in terms of the competition. Could it be a permanent injunction to not use their confidential information? Certainly. Well, you're suggesting that it's effectively a permanent injunction, right? It has become that way over the course of almost the last three years, correct? But of course — so just to go back with — apologies to the presider — to the initial question that was posed by Judge Sack, if Judge Daniels were tomorrow to issue a decision on the motion relating to really mootness, how would that affect this appeal? If he issued on which motion? A decision — I mean, there's a motion effectively, as I understand it, or set of motions, that the RSAs have expired. And just to pick up on what you just said, then the preliminary injunction doesn't make sense anymore, right? If he ruled that way or if he were — So if he were to rule that way tomorrow, what would that do to our jurisdiction, our appellate jurisdiction? It would do nothing from my perspective to your jurisdiction because our appeal is also based very largely in part in that the fact that the injunction should never have been issued in the first place because the covenants not to compete were on their face unenforceable. So there are two issues. If he simply vacated them because he's now decided that they've expired, that still leaves open the question as to whether the preliminary injunctions were ever issued appropriately in the first place. Can I follow up on that and ask you, what is it that you, as the appellant, would want from us today? That is, what is the decretal language? What is — what is the court of appeals decree that you favor or that you ask for? I would ask that the preliminary injunction be vacated, that it be determined that based on all of the arguments that we presented to the court, that the injunction was improperly issued in the first instance because under the choice of law analysis that the Missionaries case still allows, California law should have been applied and that California unambiguously and clearly would have prevented these non-compete provisions from being enforced in this manner. All right. So you're asking for a vacater of the preliminary injunction. Do you want anything more from us in the sense that — are you actually asking for a reversal rather than a mere vacater? I mean, you're asking us, if I understand you, to simply reverse the decision of Judge Daniels and effectively enter judgment for you. Is that right? Or to put it another way, if it's merely a vacater, what is it that the district court is supposed to do upon remand? Upon remand, my hope and expectation would be that we don't have to come see you again and that the district court would both vacate the preliminary injunction and rule in line with the rest of the case based upon your reversal that California law applies. Could our reversal necessarily say or imply that California law applies? Can it? Will it? I mean, can it? Should it? Will it? I think it can and I think it should. I think we need a determination once and for all, especially because this area of law has evolved since we were here last time. The public policy in California, even in Delaware, has become stronger and stronger to not allow this sort of interference with our gig economy. And so, there is— There's a countervailing policy involving trade secrets in you, you know, in California and in Delaware, but much more so in California, involving trade secrets, involving employment agreements. Right. That's true, Your Honor. And so, did you want me to address the trade secrets or— No, no. Okay. I just want to make sure I wasn't not answering your question. A sentence on how they fit into your argument wouldn't hurt. Well, I think that trade secrets is a red herring. They certainly had a right to return of any confidential information, and that happened through extensive discovery, expedited discovery, all kinds of forensic imaging, and they have it. And there is— If you look, there has been no identification of a single trade secret in this case, and there's more than just that. You have to prove that it was used in interstate commerce and that it was to our benefit and to their detriment. None of that has been presented. And when we look at the cases that they cite, you know, the Uber case is really exciting. But the Uber case involves the secret formula to the nth degree as to how we use driverless automobiles. We don't have those kind of trade secrets in this case, and there has never been an identification of one. And even if you were to believe at some point that they would prevail on that point, that doesn't allow them to have a preliminary injunction to stop people from competing on the terms and conditions of this preliminary injunction. It would be that they have to not use the trade secret. So it would be possible that the injunction would go, but the cause of action for damages would continue. It would be possible. Correct. That is possible. In other words, that would cover the amount of time—you're saying the time is run, therefore you can't have an injunction. But prior to when it ran, a court could conclude they were entitled to damages for that if damages are ascertainable, which, of course, the notion that they're not underlies the whole notion of an injunction, but still. Right. But it would not prevent them their day in court on that cause of action. You're right, Your Honor. So I'm going back. I'm an uncomplicated sort of person. I was a district judge, so I'm sort of sitting there thinking, there's been a vacater and a remand.  of me, which is to say, what do you expect of the district court upon remand? To do what? I mean that in the most mechanical, non-abstract term. I don't want to go into the big picture. I want to know, what does a district judge do at this point? Does he have—does he conduct hearings? What issues does he then address? And how? I think he follows the order, vacates the preliminary injunction, follows the rule of law that this Court has outlined as to which law applies and that the covenants not to compete were unenforceable, and then uses those rulings to rule on the motions before him from the other side on motion for summary judgment. And then those are the rules of law, the law of the case that we use to try whatever causes of action are remaining at the end of the day. Because these are legal findings. Can I ask you just one other—the separation agreement provides that the employee reaffirms his obligations under amongst—well, another thing, Section 8 of the RSA, right? What's the effect of that, if any? The RSA has been reaffirmed, not just the employment agreement. I think it's very important in terms of application of which law to follow. That was a document drafted by Capstone. Capstone chose to reaffirm and say that this document superseded and to say that it is to be ruled in accordance with California law, and specifically also incorporated Paragraph 11, which says California law applies to reaffirm these. So, yes, they reaffirmed those obligations under California law. So to the extent—because those provision in the RSA has much more than the noncompete. It has a large confidentiality provision. It has a nondisparagement provision. So those things were all reaffirmed in the separation agreements, and they were specifically said, this is the final document, this is the only document you get to rely on, and any interpretation of this you do under California law. And the reason for that is because at that point in time, California law had already progressed to where now employers cannot allow California employees to agree to have their disputes governed under any other law than California. So there's a reason Capstone drafted it that way. They knew that it would have to be enforced under California law. Thank you, Ms. Ferber, very much. This to you. It might, again, in terms of just the broad outline of what's before us, which you've heard us all are discussing, is there anything specifically that you might take issue with as to where we are mechanically as the presiding appellee? Sure, Your Honors. First of all, good morning. My name is James Yu. I represent the appellees. Just to say procedurally where we are, there are several motions that are pending before the district court judge. And one thing that Ms. Ferber's papers actually don't mention was, first of all, there was a motion to vacate the injunction that was made. This was the first injunction that was made in mid-2018. And at that injunction motion, we opposed it. We raised the fact that the restricted stock award agreements contain expressed tolling provisions. And Judge Daniels found that, denied the motion and expressed a lot of frustration about the fact that for months after the injunction was entered, the defendants continued to violate that injunction. And they continued to attempt to do business with Capstone's customers. Now, he didn't sanction them, but he did say on the record at the hearing, and as I understand it, defendants, you've been talking to Capstone's customers since at least last month. And they would not have stopped had one of these customers not brought it to our attention. And I'm bringing this up because this was all on the record below. It's in the appellate record. And Judge Daniels said, come back to me in May of 2019. And at that time, I will consider a motion to vacate the injunction. The appellants don't actually bring that motion to vacate until late last year. And finally, Judge Daniels heard that motion, the second motion to vacate in October or it was either September, October of last year. We argued it along with our motion for summary judgment. And those motions are still sub judice before Judge Daniels. Your motion for summary judgment as to the contract claim, the Almost all the claims, correct. Breach of contract, misappropriation of trade secrets, breach of fiduciary duty. And on that note, just as a foundational matter, I do want to highlight, because I think it's important to note, based upon the clear error standard, that the appellants actually don't dispute or seriously challenge a lot of the evidence that constitutes the vast majority of the underlying facts that gave rise to the Court's preliminary injunction motion. I mean, at a high level, there's no dispute that these were four very senior executives of Capstone. They were former senior Pinnacles employees who engaged in the campaign, some of them while they were still working at Capstone, to replicate Capstone's business. There's no dispute that they made pitch presentations and solicited Capstone's customers, recruited dozens of key employees. They took Capstone's proprietary software program called MobileTrack, and they also had access to thousands of Capstone files that they used, which included customer contracts, financial snapshots, called focus reports, that provides a lot of site-level data. It's a very data-driven industry. Pricing data, along with the documentation for the software that they went into. And after we – after the injunction was entered, expert testimony has revealed that their copycat program is a near-verbatim copy of the MobileTrack software that they took. All of this is outlined in detail in the Court's 70-page findings of fact. Your view, as I understand it, is that even as a matter of California law, these RSAs are legitimate and not contrary to California public policy. That's correct, Your Honor. And look, the way the choice of law analysis works is almost like, you know, imagine a flowchart. First, under our – it's our argument that under New York's choice of law rules, you looked at the Missionaries case. You don't engage in any choice of law analysis, and therefore, under Delaware law, the RSAs are enforceable. But Judge Daniels went further. Even if Missionaries doesn't say that, and you have to engage in a traditional conflicts analysis, the center of gravity test, the contacts, all point to Delaware as having the greater material interest. Or at least, insofar as California does not have a materially greater interest. I mean, we're talking about – all the cases that they rely upon are all California- company. And refresh my recollection. Why is Delaware – why does it have greater interest than the other two jurisdictions? So, a couple of things. First of all, Capstone is incorporated in Delaware. And Delaware Code Section 2708 says that for contracts that are worth over $100,000 that include a Delaware choice of law, Delaware, quote,  And there's a – there's a contract provision identifying Delaware laws applicable. Yes. There is a Delaware choice of law provision in the RSA agreement. And it actually says that this agreement and all issues and questions concerning the construction, validity, enforcement, and interpretation of this agreement and the plan will be governed by and construed in accordance with the laws of Delaware without giving any effect to the choice of law or conflict of law rules or provisions. And again, as I was saying, this is not a California-centric business. Yes, the defendants resided in California. But Capstone is a principal place of business in Georgia. It's incorporated in Delaware. It's a national business. All the customers they service, their household names, CVS, Home Depot, with customer sites all located all throughout North America, that You say they service them. Does that mean, as a general rule, it's wherever CVS is, Capstone is? Not the individual stores. So, with respect to, let's say, CVS, for example, what they have, they have distribution centers that are located all throughout the United States. And Capstone provides a mobile workforce. So it would be anywhere that that sort of a distribution center is located. They would service that? Yeah, it would not be for all distribution centers. I don't want to misstate the record. But for many distribution centers, CVS hires Capstone or has contracts with Capstone for that logistics work to handle the movement of freight at that distribution center. Correct. So, in this regard I don't know whether any are in New York. I'm just curious. Well, not for CVS, but for one of the customers at issue, UNFI, yes, they do have a facility in New York that is actually serviced by Capstone. And it's one of the distribution centers that was at issue. Just go for it. Go ahead. Absolutely, sure. And I do want to point out that each of the appellants here, they were responsible for operations at the distribution centers nationwide. They admit in their depositions to their frequent travels to these customer sites. And the appellants point themselves out as a small company. Before the injunction was entered, they were attempting to negotiate contracts with these same customers to take over nationwide all of the business of these customers. UNFI is one of the examples. And they testified that their annual business is worth $40 million. Had they successfully taken that business before the injunction was entered, they would not be the small company that they claim to be. Mr. Yu, you heard the questions I asked opposing counsel. Help me to understand how these proceedings took place. What kind of a hearing was held before the preliminary injunction was issued? And then eventually, I'm going to ask you the very same questions I asked before. That is, what is it that you want from us? Or would you wish to have from us if you were to prevail on your arguments? But first, describe to me this. We've got this helpful timeline for which we're grateful. Tell me what happened. What led to the preliminary injunction? What kind of a hearing did you have? And why was it not that this is discretionary, of course, why was not no consolidation of the hearing with the trial and the merits under Rule 65A2 of the Rules of Civil Procedure? Sure, Your Honor. First of all, I just want to note for the record that I only just learned this morning that this chart was admitted for purposes of today's hearing. Okay. Excuse me? You wouldn't refer to it as helpful. Well, I think that their information isn't entirely accurate. I think it's missing some key information. But that being said... Well, we should give you a chance. Frankly, I'm sorry that you didn't know it was coming. That's more or less a problem of our clerk's office, perhaps, or of me as presider. But why don't you feel free within a week to send us your letter commenting on this and providing whatever competing timeline of events you think appropriate. Well, just at first glance, and I appreciate that, Your Honor. We'll certainly do that. We did actually submit a letter on, I think it was either Thursday or Friday of last week, when they tried to put this into the record, objecting to it. But that being said, just at first glance, I think the dates themselves are accurate. I just think it's missing other key dates that belong in this chart. But to answer your question, Mr. Navaretti leaves Capstone, just to give Your Honor the timeline. He left Capstone in mid-2016. Several months later, Mr. Poffenberger, who is the senior vice president, he leaves in February. And then in May, Steve Willis, the vice president, gives notice. And then at the exact same time, DPI, who is a customer of Capstone, says, you know, we're transitioning our services elsewhere. Thank you very much. And the next thing you know, we ask them where they're going. They wouldn't tell us at first. And then we learned that they went over to Humano. And then from there, we learned through discovery. We filed our action, claiming breach of the restricted stock award agreements, as well as other common law causes of action. All of these people that we're talking about were former Pinnacle people. They're all former. Everybody's a former Pinnacle person, correct? And we also learned that several other personnel who had left during that time frame had all started secretly working for Humano at that time. And then when we started putting two and two together, we realized not only they took DPI's business, they had also been for weeks talking to Home Depot, CVS, UNFI. And then it was after we learned all of this through discovery, expedited discovery, we put all this into the record. And that's when the first injunction was granted. We went in immediately for a TRO. We got the expedited discovery. We took deposition testimony. What kind of a hearing was held? The first preliminary injunction? Yes. It was oral argument. Just oral argument. Just oral argument, correct. No other evidence. But we put into the record all of the evidence to support the entry of a preliminary injunction, correct? Anyone asked for an evidentiary hearing? Nobody asked for an evidentiary hearing. And then it comes to the Court of Appeals. The injunction is vacated. And what happens then, procedurally? So because the injunction is vacated, we were concerned that rightfully, given the factual circumstances of the case, that there's been, and I don't want to get into this right now, but there's been just a very litigious history between the parties here. And we were rightfully concerned that once the injunction is lifted, and probably even before the mandate was entered, that the defendants would start talking to Capstone's customers again. And, you know, at that point, we already had... A sense of urgency. There was a sense of urgency. We had also, in the middle of discovery and following just regular discovery, we just kept learning more and more stuff that was, you know, very, very damaging for, we believe, to our clients' business interests. And so we felt that the injunction had to be immediately put back into place. We were in front of the magistrate judge, if I recall, and we were able to negotiate a stipulated stay pending the mandate and to allow further briefing on the issues that... And to keep the preliminary injunction in place during this period. That's correct. But the stay that we negotiated was only for several weeks, during which time we submitted additional briefing. We supplemented the record with all the additional new facts that we learned during the regular course of discovery back to Judge Daniels. And once that stay had ended, we wrote a letter to Judge Daniels, please make a decision on this. And that's when he entered, with modifications to our proposed findings of fact, the second injunction. The reason that he used your proposed findings was the sense of urgency that it had to be done. Well, I believe he actually says that in the transcript that's in the special appendix, correct? There was additional evidence before Judge Daniels at that point? There was plenty of additional evidence. There was, because, you know, the first phase of discovery that we had before the first PI was strictly on an expedited basis. At this point now, we had already taken multiple depositions of other personnel. We learned, for example, that they had access, again, to thousands and thousands of files that they used that we learned through forensic discovery. We learned through non-party depositions that they had, there was, that Mr. Poffenberger, for example, months after he left Capstone was still feeding them capstone files and using capstone files that contain pricing information, for example. And actually, I do want to remind the Court that we also have a motion to expand the record here which contains facts that we learned after the Court entered its second injunction, which is that there was additional evidence found through forensics, through our forensic expert, showing that there were documents that were created after the defendants had already left Capstone that were on their computers and how they got this sensitive information which was used by our business intelligence team to price out pitch presentations to prospective clients. You know, the only person who would have had it was Steve Willis because he was the last one who left and that was created right before he left. And the motion to vacate, to expand the record is pending before us or before Judge Daniels? That's pending before Your Honors. And the only reason why I bring this up is because this is all now part of the district court record that's in front of Judge Daniels as well on the pending motion to vacate below that he still hasn't decided. What worries me, and it's not a secret based on my questions, is that Judge Daniels, as I understand it, could issue a decision tomorrow. That's correct, Your Honor. And what effect, if he were to rule or decide that the RSAs have expired and that, and I understand what your adversary wants by way of something beyond vacating the FBI, but if he were to rule that the RSAs have expired and therefore, for the most part, much of this is, I guess, but much of what's in front of him is moot, what effect would that have on us? Well, I believe that there would be no issue for this court to decide. I think Second Circuit case law is actually pretty clear about it. There are plenty of cases where during the pendency of the appeal, a preliminary injunction is either expires or vacated and that therefore moots. Any amount of time that it takes us to decide cases like this, for better or for worse, assuming it was done in the ordinary course, the way we ordinarily decide appeals, and this has not been expedited, even though you asked for it, somebody asked for it to be expedited, aren't we better off in some way of encouraging the district court to do what it said it would do by the end of last year rather than pushing forward ourselves and trying to answer questions that may all be completely moot in a month or two months while we're still trying to figure out, we're still reading the record in order to write an opinion. Well, I agree to some extent, Your Honor. I mean, look, in a perfect world, I would have preferred Judge Daniels to have made a decision on this before I came here today as well. I can't, look, I can't speculate as to why a decision hasn't been made yet on those motions, but... What do you want now, to go to the same question that I asked your opposing counsel, what decree do you want from us? If you were to prevail in all respects, what would that order look like? Your Honor, I think we just needed an order saying that the preliminary injunction is affirmed. I don't think there's any abusive discretion here. And then we would simply remand it for further proceedings before the district court. That's correct, Your Honor. And if I may, I know I'm out of time, I just want to quickly address, because there has been a lot of argument about whether or not these agreements are made in connection with the sale of the business. That's actually a whole side issue, because we only get into that issue if the court finds, in my tree, as a flowchart, as I said earlier, first, you know, New York law, Delaware law applies because of missionaries. It's an issue of California law. It's an issue purely of California law. So first you have to find... You told me that you prevail even under California law. And that's correct, because there's two exceptions to California law. One is in connection with the sale of business. And here, Judge Daniels made a factual finding that these RSAs were signed in connection with the sale. And in that regard, look, the reason why Mr. Shelton and Mr. Haley weren't, you know, signed different agreements is because they weren't coming back with Capstone. But it was certainly, in the grand scheme of things, Capstone would not have gone through with the deal if Mr. Navarrete and Mr. Poffenberger did not come on board. And it was clearly understood that they were provided with these agreements before the merger, and they were expected to sign these in connection with the sale of the business. And had they not done so, I don't think that the merger would have gone through. So, but secondly, even if Judge Daniels got that fact wrong, California law still allows for restrictions on solicitation of customers. And there's no non-compete here. We're only talking about solicitation of specific finite set of customers. California law will allow that to the extent necessary to protect trade secret information. And here, there is ample evidence found by the district court that should be reviewed for a clear error that the appellants here have engaged in a campaign to take a lot of the information, use the information, copy the information, including software code. And in fact, a lot of it was destroyed that would have prevented us to, in violation of the court's preservation orders, would have allowed us to do more forensic discovery to see to what extent that they use this information in their efforts to compete. If I can ask the presider, are we expecting to submit further comments with respect to the timeline or not? I'll take the court's guidance on this issue. I'd be happy to supplement this. Whatever you think is appropriate after reviewing this, you should submit to us. Did I give you a date earlier? You just said a week, but if you can... A week. You want more time? No, one week is fine. One week from today. And am I right that the Delaware Chancery Court has talked about California's interests in regulating employment relationships recently? Actually, Your Honor, that is correct. And there was actually even a more recent case that came out that after all the briefing was closed... Which also seems to point to California law. No, actually, this one points to Delaware law, and it actually distinguishes the previous ones that point to... So, Your Honor, if I may, I believe you're referring... What case is that? You're referring to... First, I believe you were referring to the Nuvasiv case that the appellants provided in Rule 28 letter. And in that case, yes, the court found, and I believe that's called Nuvasiv, the court found that California law should apply but that case involved, again, pure California parties, California employer, California employee. In the case of W.R. Berkeley v. New Mellon, that's 2019 W.L. 5457689. It's a District of Delaware case, October 24, 2019. And there, the court upheld a Delaware choice of law against a California resident who signed an agreement in California, set up a competing business in California. And it noted, it distinguished, actually, the Ascension case, which is what Nuvasiv relied on. It was the same judge, it was the same trial court judge that decided Ascension, decided Nuvasiv, also decided Ascension. He says, Ascension does not address the Third Circuit's case of Coface, which also cites to the Delaware statute that I mentioned earlier that says that there should be a presumption of a significant relationship with Delaware for companies that are incorporated in Delaware. And he also held that, noted that Ascension relied on the facts that all the parties recited in California, whereas here, in that case, the parties did not. And I would say that that is, that this case, the W.R. Berkeley case, is more factually on point with. State and citation again. Sure. 2019 Westlaw 5457689, District of Delaware case, October 24, 2019. All right. Thank you very much, Mr. Yu. Thank you, Your Honor. Appreciate it. Ms. Ferber has reserved two minutes, and this time I'll adhere to the time limitation. We've been grateful to both of you. Thank you, Your Honor. So first off, I want to say that I think we have to get back to the basics. And the basics is that these covenants and this preliminary injunction have been in place far longer than anybody bargained for. To send this just back down or to sit and wait for the district court would be further prejudicial to the extreme prejudice of my clients. And to be very clear, when we met with Judge Moses, because the other side was concerned we would compete, she set the timeline and urged us to get client approval to extend and stipulate to extension of the preliminary injunction long enough to give Judge Daniels time to really look at this. To say that we didn't submit, the record's clear. We submitted our own findings of fact and conclusions of law. We have objected to their 77 pages. This is the longest one. And we found, we cited three cases for you that show that ad hoc-ing in this manner is not inappropriate. And this is the most extreme example. And in the record on the motion for summary judgment that counsel brings up of all of these bad acts, I'll put them together, all of these terrible things my clients have done that we're supposed to believe happened exactly as Capstone says, we have contrary evidence to all of them. Their expert says one thing, our expert's gonna say another. There's no determination that someone has copied something until a trier of fact makes that. There's also been absolutely no evidence that any of these old 2017 contracts that supposedly my client had have been used. It's the same cycle to make it more confusing. It's not that confusing. So what we would like, again, to be very clear. Do you believe that Judge Daniels made a factual finding that these covenants were in connection with the sale of a business? Yes, and he used those words, which were Capstone's words, in connection. Is that something that's subject to a clear error analysis? Yes, it is, and it's contrary. So we'd have to find that that's, if we were to agree with you that this is a matter of California law, that that was a clear error. Clear error, and in connection with is a clear error because that's not what the statute says. Okay. Thank you, Your Honor. Thank you very much. Both of you, we appreciate it very much, and we'll reserve decision.